

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 4:18-MJ-__268__ |
| MOHAMED TOURE           (1)<br>DENISE CROS-TOURE      (2) | |

## CRIMINAL COMPLAINT

I, Special Agent Katherine Langston, the undersigned Complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## BACKGROUND

I am a Special Agent with the U.S. Department of State, Diplomatic Security Service (DSS) and currently assigned to the Houston Field Office. The information in this Affidavit is based on my investigation, my training, knowledge, and experience, and through Diplomatic Security Service information that has been related to me through data, reports, other agents, sworn law enforcement officers, and reliable witnesses.

## INTRODUCTION

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2. I have been a DSS Special Agent since 2011 and am currently a participant of the Houston Human Trafficking Task Force (HTTF). The HTTF is a collaboration of local, state and federal law enforcement agencies working together to develop human trafficking investigations and prosecutions in the Houston area. As a DSS Special Agent, I have led, participated or consulted on over 100 investigations and arrests, to include those involving forced labor and sex trafficking, smuggling and harboring of illegal aliens, and passport and visa fraud.

**Complaint - Page 1 of 13**

Prior to DSS, I was a Special Agent with the U.S. Secret Service beginning in 2002, where I received training in the preparation, presentation, and service of criminal arrest and search warrants and conducted criminal investigations of federal offenses.

3.  I have personally participated in this forced labor investigation since September 22, 2016, and have obtained the facts set forth in this affidavit through my participation in the investigation described below by conducting interviews of witnesses; from oral and written reports of other law enforcement officers; and from records, documents and other evidence obtained during this investigation. I have also relied on additional information provided by other law enforcement organizations, including, but not limited to: Southlake Police Department, Department of Homeland Security, Texas Department of Public Safety, and Texas Workforce Commission. Since this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known to me concerning this investigation.

4.  This affidavit sets forth facts, and suggests reasonable inferences from those facts, establishing that there is probable cause to believe that between October 28, 2000, and continuing through in or about August 2016, in the Northern District of Texas, Fort Worth Division:

    a.  **Mohamed Toure, and**
    b.  **Denise Cros-Toure,**

have each aided and abetted each other in committing the offenses of Forced Labor under 18 U.S.C. §§ 1589 and 2.[1]

## PROBABLE CAUSE

5.  On September 22, 2016, the YMCA International Services referred a potential forced labor matter to the HTTF. As a result, the DSS Houston Field Office initiated a forced labor investigation, and I was assigned as the lead case agent. Through the course of the

---

[1] Section 1589 was enacted on October 28, 2000.

**Complaint - Page 2 of 13**

investigation, I have identified **Mohamed Toure ("Toure")** and **Denise Cros-Toure ("Cros-Toure")** as individuals who harbored Female Victim 1 ("FV-1"), a young girl from Guinea, Africa, who was unlawfully present in the United States, in their home in Southlake, Texas, and through force, fraud, and coercion compelled her to provide labor and domestic services, to include but not limited to cooking, cleaning and providing childcare, without pay for 16 years between approximately January 2000 and August 2016.

## Background Information

6. Through the investigation, I determined that FV-1 is citizen and national of Guinea. FV-1 entered the United States through the International Airport Houston (IAH) Port-of-Entry on January 19, 2000, with her Guinea Passport and a U.S. B-2 Non-Immigrant Visa (NIV), commonly known as a "tourist visa." Records show that FV-1's B-2 NIV was issued on December 22, 1999, and expired on March 21, 2000. An individual who remains in the United States past the expiration of his or her B-2 NIV remains in the United States in violation of law.

7. Through the investigation, I determined that FV-1 was a minor when she entered the United States. FV-1's Guinea passport and B-2 NIV listed her date of birth (DOB) as March 31, 1994, indicating that she would have been 5 years old in January 2000. I have also reviewed the photograph on her passport, which was issued on May 18, 1999, and she appears to be a child.[2]

8. DSS Special Agents have interviewed FV-1 multiple times beginning on October 28, 2016. FV-1 stated that she was born in Guinea and lived in a village with her family in a one-room, mud hut with a thatched roof and no electricity. Her father was a farmer and her mother sold produce to support their family. Although FV-1 occasionally attended school, she is not literate. She grew up speaking Malinké, a language spoken in Guinea, and a little French. She did not know English when she arrived in the United States in January 2000.

---

[2] According to FV-1, she does not know her actual age and has never celebrated her birthday. She believes that she is the same age as **Toure** and **Cros-Toure's** oldest child, who was born in 1991. **Toure** and **Cros-Toure** also told Southlake Police Department that FV-1 was born in 1990 during an incident described below. Additionally, an unverified Guinea birth certificate obtained during the investigation, listed FV-1 DOB as May 10, 1986, indicating that she could have been 14 years old in January 2000.

**Complaint - Page 3 of 13**

9. Through the investigation, I determined that **Toure** and **Cros-Toure** are also from Guinea and are familiar with the U.S. immigration system. **Cros-Toure** obtained a U.S. B-2 NIV in 1980 and is believed to have stayed beyond its expiration. **Toure** was granted asylum from Guinea on October 27, 2000, and as a result, **Cros-Toure** was granted derivative asylum status as his wife. Both later became U.S. Lawful Permanent Residents in 2005.

10. Through the investigation, I determined that **Toure** and **Cros-Toure** are educated and have significant assets despite not appearing to work in the United States. They purchased their current home, which is located in Southlake, Texas, for approximately $370,000 in 1991, while **Cros-Toure** was enrolled in college. The home is currently valued at approximately $590,000. Texas Workforce Commission records do not reflect any employment for **Toure** and show that **Cros-Toure** briefly worked for Delta Airlines Incorporated from approximately July 2005 to June 2006 and later as a substitute teacher beginning in 2016. Bank records reflect significant overseas deposits that appear to be **Toure** and **Cros-Toure**'s primary source of income in the United States. For example, between 2010 and 2016, records reflect that they received on average approximately $200,000 a year. Together, they have five children who were born in the United States in 1991, 1992, 1995, 1998, and 2002, and who are attending high school or enrolled in college.

## FV-1's Entry Into the United States

11. FV-1 stated that she was young when her father asked her if she wanted like to go work in the city (in Guinea). He then brought her to the home of **Cros-Toure's** parents ("the Cros family"), where FV-1 stayed for approximately one to two years and cared for the Cros family's blind daughter (Cros-Toure's sister). FVI recalled an incident when she was upset and the Cros family told her to stop crying because they were her family now.

12. At some point during the time FV-1 was working for the Cros Family in Guinea, **Cros-Toure's** mother and blind sister traveled to the United States to visit **Cros-Toure**. Subsequently, **Cros-Toure's** father drove FV-1 to an airport and placed her on a plane to the

United States. FV-1 does not recall much about the trip to the United States. She traveled alone, and her most vivid memory is of a kind flight attendant who gave her cookies and a toy.

13. FV-1 landed in Houston, Texas, and took a connecting flight, by herself, to Dallas. **Toure, Cros-Toure**'s sister, and the three oldest Toure children, who were approximately 5, 8, and 9 years old at the time, were at Dallas/Ft. Worth International Airport when FV-1 arrived. **Toure** then drove FV-1 to the Toure family residence. Immigration and travel records further reflect that FV-1 arrived in Houston on January 19, 2000. There are also no records indicating that FV-1 left the United States after her B-2 NIV expired on March 21, 2000.

14. FV-1 stated that **Toure and Cros-Toure** took her Guinea passport and B-2 NIV from her when she arrived in the United States. During a recorded conversation in 2016 that is discussed below, **Cros-Toure**, in **Toure's** presence, referenced FV-1 not having her passport at that time.

### Working and Living Conditions in the United States

15. FV-1 stated that, when she first arrived, **Cros-Toure**'s mother gave her orders regarding her work at the Toure residence. Her initial job was to care for the Toure family's youngest son, who was approximately two. After **Cros-Toure**'s mother and sister returned to Guinea, **Cros-Toure** took over giving FV-1 directions regarding her work at the home. Over time, FV-1's job responsibilities at the Toure residence increased. **Cros-Toure** directed FV-1 to cook, clean, do the laundry, and garden, among other things, such as mowing the lawn and painting.

16. FV-1 stated that her work schedule was the same every day of the week. She typically started work between 6:30 a.m. to 7:00 a.m. As soon as the Toure children left for school, FV-1 would start cleaning, making the beds, vacuuming, cooking, and gardening, among other things, depending on what needed to be done. She would continue to work until the children went to bed at night.

17. FV-1 stated that she initially never left the Toure residence. She was unfamiliar with the area and did not speak English at the time. She does not recall ever being left alone at the residence. Over time, **Toure** and **Cros-Toure** would send FV-1 to buy ingredients at a nearby grocery store that was within walking distance. **Cros-Toure** would give FV-1 cash to make the purchases, and she would check the receipt and change upon FV-1's return. Since FV-1 could not read or write English, she would shop by sight for the vegetables that she recognized and by the pictures on canned and boxed items. **Toure** and **Cros-Toure** also started directing FV-1 to walk their children to school.

18. DSS Special Agents interviewed Witnesses 1 through 4 ("W-1 to W-4"), who all observed FV-1 performing labor and domestic services for **Toure** and **Cros-Toure** at various times between 2000 and 2016. For example, W-1 stated that she observed FV-1 covered in paint and painting the walls of the Toure residence. W-2 and W-3 stated that they believed that **Toure** and **Cros-Toure** had a "nanny," because they had observed FV-1, walking the younger Toure children to school, mowing the lawn, and walking the dogs. W-4 stated that FV-1 did not appear to have any friends, a social life or a job away from the Toure residence, and she always seemed to be doing something for the Toure children, including walking them to school.

19. FV-1 stated that **Cros-Toure** directed her to set the table for meals. **Toure** and **Cros-Toure** did not allow her to eat with the family. W-1 stated that she went to the Toure home for dinner and observed FV-1 serving the meal and cleaning afterwards and confirmed that FV-1 did not join the family for dinner.

20. **Toure and Cros-Toure** treated FV-1 differently from their children, even though they were close in age, because FV-1's purpose was to provide labor and domestic services in the Toure residence. Examples include but are not limited to the following:

   a. The Toure children attended school, while FV-1 did not. Records from the Carroll Independent School District show that the Toure children were enrolled in school. There are no records that FV-1 attended school. DSS Special Agents interviewed Witness 5 ("W-5"), who asked **Cros-Toure** whether FV-1 attended school, and **Cros-**

**Toure** replied that it was too hard for FV-1. DSS Special Agents also interviewed Witness 6 ("W-6"), who stated that **Cros-Toure** told her that FV-1 had finished high school. Additionally, records related to the Toure children identify "Other Children Living at Home," and while the other Toure children are named, FV-1 is not included.

b. FV-1 stated that the Toure children learned to swim, ride bikes, use computers, and drive. The Toure children also competed in cross-country and other sports, and upon high school graduation, they attended college. **Toure and Cros-Toure** never provided FV-1 with any of those opportunities.

c. W-5 stated that she met FV-1 at a school soccer game involving the Toure children in 2003. After meeting FV-1, W-5 would ask **Cros-Toure** if FV-1 could come and play with W-5's children, but **Cros-Toure** would never allow it because she said FV-1 was too busy. Additionally, when W-5 would drop off the youngest Toure child after soccer practice, FV-1 always met the child outside to take him into the Toure home.

d. **Toure** and **Cros-Toure** purchased cars for their three oldest children, while FV-1 did not have a car, per records from the Department of Motor Vehicles. Furthermore, records from the Texas Department of Public Safety confirm that the Toure children had driver's licenses, while FV-1 did not.

e. FV-1 stated that **Cros-Toure** did not furnish her with a wardrobe like the Toure daughters. The Toure daughters had closets full of clothes. **Cros-Toure** provided FV-1 with old clothes, including some belonging to the Toure sons. Additionally, while **Cros-Toure** taught her daughters how to care and style their hair and supplied them with hair products, she did not provide the same to FV-1. W-5 stated that while the Toure children always looked neat and tidy, FV-1 always looked like she was wearing old, ill-fitting clothes. I have also reviewed photographs from the relevant time period that show FV-1 and the Toure children, and the Toure's daughters appear to be wearing clean, current-trend clothes and their hair looks well-kept, whereas FV-1 appears to be wearing worn, ill-fitted clothing and her hair looks unkempt. Furthermore, in 2002, a Southlake Police Department officer, who encountered FV-1 during an incident set forth below, described FV-1 as "wearing

dirty unkept clothing."

21.   FV-1 stated that for years, **Toure** and **Cros-Toure** required her to sleep on the floor in one of the Toure children's bedrooms. When one of the Toure children graduated from high school, which the investigation determined was in 2011, FV-1 was permitted to sleep on an old twin bed in one of the rooms, while that child slept in a queen bed. FV-1 was further required to store her clothes in a dresser in the upstairs hallway for the majority of the time she lived at the house.

22.   FV-1 stated that **Toure** and **Cros-Toure** and their children took a vacation one summer to Paris, France, and sent FV-1 to live with another family in Dallas. Travel records show that **Toure** and **Cros-Toure** and their children traveled from the United States to France in the summer of 2003. No travels records were located for FV-1. In my training and experience, I know individuals departing or entering the United States on international flights are expected to show a valid passport or other acceptable document that denotes identity and citizenship to immigration officials. In 2003, FV-1 was present in the United States in violation of law, as her B-2 NIV had expired in March 2000. Furthermore, her Guinea passport expired on May 17, 2003.

23.   FV-1 stated that **Toure** and **Cros-Toure** never took her to a doctor's office, except on one occasion. On that occasion, approximately four years ago, FV-1 woke up from a horrible toothache. **Toure** and **Cros-Toure** drove her to their friend's house where FV-1 was given a shot to calm the tooth infection. Later, **Toure** drove FV-1 to a large hospital in downtown Dallas, where her tooth was removed. Records from Texas A&M College of Dentistry confirm that FV-1's tooth was extracted on July 23, 2014. The records include **Toure** and **Cros-Toure's** address and **Cros-Toure's** cellphone number, and further list FV-1's DOB as March 21, 1991.

24.   FV-1 stated that **Toure** and **Cros-Toure** told others that she was their niece. As FV-1 became older, they began to tell people that she had finished high school and was

contemplating college. Although untrue, FV-1 would repeat it, because she was embarrassed that it was not true.

25. FV-1 stated that when the three oldest children had gone to college, which the investigation has determined was around 2013, **Cros-Toure** permitted FV-1 to work outside of the home several times, but FV-1 had to obtain **Cros-Toure's** permission and provide her with all of the details, including location and times. For instance, W-4 occasionally asked FV-1 to babysit her children. FV-1 made on average about $20 to $40 per job. Eventually, FV-1 was able to give $50 of that money to one of the Toure children to purchase a Kindle Fire tablet for her.

### Physical and Emotional Abuse by Toure and Cros-Toure

26. FV-1 stated that **Toure** and **Cros-Toure** started physically abusing her when she did not perform the labor and domestic services to **Cros-Toure's** liking. **Cros-Toure's** punishment methods increased as FV-1's pain tolerance increased: for example, slapping led to the use of a belt, which then led to the use of an electrical cord to strike FV-1. When **Cros-Toure** would use an electrical cord to beat FV-1, FV-1 would raise her arms in defense. I have observed visible scars consistent with being struck by an electrical cord on FV-1's arms. As FV-1 became older, **Toure** and **Cros-Toure** punished her less, because she made fewer mistakes. FV-1 recalled specific assaults, including but not limited to the following:

   a. On one occasion, while the Toure children were at school, **Cros-Toure** found FV-1 upstairs drawing instead of cleaning the house. **Cros-Toure** became angry and took FV-1 to the bathroom and started hitting her.
   b. On another occasion, **Cros-Toure** ripped FV-1's left earring out, tearing her ear lobe. I have observed a visible scar and slit in FV-1 earlobe consistent with having an earring ripped from her pierced ear.
   c. On another occasion, **Toure** struck FV-1 and twisted her arm.
   d. On another occasion, **Toure** sat on FV-1's back while **Cros-Toure** was trying to hit FV-1 with the belt, but FVI was moving around and trying to grab the belt. **Toure**

came in and sat on FVI's back so that **Cros-Toure** could strike FVI on the bottom with a belt.

27. FV-1 stated that from the moment she arrived at the Toure residence, **Cros-Toure** frequently yelled at her in connection with FV-1 work. **Cros-Toure** also yelled at FV-1 if she perceived that FV-1 was not listening to her. Sometimes **Cros-Toure** would tell **Toure** what was wrong with FV-1's work, and **Toure** would yell at FV-1. On one occasion, **Cros-Toure** told FV-1 that she was just a "slave." On another occasion, during a recorded conversation in 2016 that is discussed below, **Cros-Toure** called FV-1 a "whore" in front of **Toure** and told FV-1 that she was "just a little nothing." When FV-1 told **Cros-Toure** that she had proof of the abuse she had suffered over the years, **Toure** stated "who do you think you are?".

28. FV-1 stated that **Cros-Toure** routinely kicked her out of the Toure house as punishment related to FV-1's labor and domestic services. On occasion, FV-1 had to sleep in a nearby park until **Cros-Toure** permitted her to return. FV-1 had nowhere else to go. She was undocumented, did not speak English, did not have any money, did not have identification, and did not have a car.

29. FV-1 stated that on one occasion, after **Cros-Toure** kicked her out of the Toure house, a police officer encountered her in the park and returned her to the Toure residence. A report from the Southlake Police Department shows that officers were dispatched to Bicentennial Park for a possible runaway on April 30, 2002. Per the report, FV-1 was "wearing dirty unkept clothing, and was very visibly scared and nervous." She directed the officers to the Toure residence. **Cros-Toure** told the officer that FV-1 was her cousin whom they were adopting from Guinea.[3] **Cros-Toure** stated that she would be home-schooling FV-1 until she could attend public school. **Cros-Toure** did not know FV-1's date of birth and advised "they don't keep track of that information" in Guinea. The report reflected FV-1 year of birth as 1990. **Toure** told the officers that he and **Cros-Toure** had been "trying to find" FV-1 when she did not come

---

[3] There is no birth certificate for FV-1 in the Texas Bureau of Vital Records, which would have been produced if **Toure** and **Cros-Toure** had legally adopted FV-1.

Complaint - Page 10 of 13

home. When the officers asked Toure (1) how long FV-1 had been missing, (2) if she was allowed to leave alone, and (3) why they had not called 911, **Toure** seemed evasive. The report does not indicate that **Toure** answered the questions.

30. FV-1 stated that **Cros-Toure** threatened to send her back to Guinea. Eventually, closer in time to when FV-1 escaped in 2016, FV-1 responded to those threats by telling that **Cros-Toure** that she wanted to go back. **Toure** then took FV-1 to a CVS to have a passport photo taken, but neither **Toure** nor **Cros-Toure** took any other steps towards sending FV-1 back. During a recorded conversation that occurred in 2016, **Cros- Toure** told FV-1, in the presence of **Toure**, "I will get your passport, [when] I am ready – when I have the money to pay the people. That's the way it's going to work." Later in the conversation, **Cros-Toure** stated that she will not "waste" money on FV-1's passport.

### Escape in August 2016

31. FV-1 stated that **Cros-Toure** became angry with her on Father's Day (June 19) in 2016, because FV-1 did not prepare anything for dinner. During this incident, **Cros-Toure** called **Toure** and **Toure** yelled at FV-1 about the dinner. When FV-1 raised her voice back to **Toure, Cros-Toure** then yelled at FV-1. When FV-1 attempted to flee the Toure house following the incident, **Cros-Toure** blocked the stairway. FV-1 then jumped out of the window to escape. FV-1 spent the night in the park, and then contacted W-4 and stayed with W-4 for a few days. W-4 observed injuries on FV-1.

32. W-4 stated that she was unable to care for FV-1 at the time, so she called W-6 to help. W-6 picked up FV-1 and let her stay at her residence for approximately a week. FV-1 told W-6 about **Toure** and **Cros-Toure's** mistreatment of her and that she had never attended school. Sensing no other options, W-6 returned FV-1 to the Toure residence. W-6 relayed some of the information FV-1 had confided in her to **Cros-Toure**. **Cros-Toure** told W-6 that FV-1 was lying, that FV-1 had finished high school, and that they were sending her back to Guinea.

33. After being returned to **Toure** and **Cros-Toure**, FV-1 used her tablet to record a conversation with **Toure** and **Cros-Toure**, which has previously been referenced.[4]

34. Subsequently, **Cros-Toure** would not allow FV-1 to do anything or go anywhere. When FV-1 asked to go out, **Cros-Toure** told her no and that her responsibilities were in the house. FV-1 felt stuck, that she had no options, and contemplated suicide.

35. On or about August 9, 2016, FV-1 reached out to an old neighbor, W-1, who had provided FV-1 with her phone number years ago. They met at a local Starbucks and FV-1 explained that things had gotten worse for her at **Toure** and **Cros-Toure's** residence. W-1 contacted W-5, W-1's friend who also had lived in Southlake and was familiar with FV-1 and the Toure family. W-1 told FV-1 to return to the Toure residence and get proof, such as photos, that she had lived there over the years. FV-1 obtained photographs of her and the Toure family, which I have reviewed. Several witnesses then helped FV-1 escape the Toure house on or about August 16, 2016, after the weekend was over. When she returned to the house, FV-1 found her travel documents and took them with her when she left. On August 17, 2016, FV-1 waited until **Cros-Toure** and the children were away from the house and then fled carrying only a duffle bag and backpack. She was then brought to the YMCA.

36. Through the investigation, I determined that **Toure** and **Cros-Toure** did not contact the police to report FV-1 missing, or for any other purpose, following her departure from their home in August 2016.

[remainder of page left intentionally blank]

---

[4] The conversation occurred in French and English. The French portions were translated by the State Department.

**Complaint - Page 12 of 13**

## CONCLUSION

37.   Based on the foregoing facts and circumstances, I respectfully submit that there is probable cause to believe that between October 28, 2000, and continuing through in or about August 2016 within the Northern District of Texas – Fort Worth Division, **Mohamed Toure** and **Denise Cros-Toure** committed the offense of Forced Labor and aided and abetted one another in committing Forced Labor. the offense of Conspiracy to Commit Forced Labor.

Katherine Langston
Special Agent
Department of State
Diplomatic Security Service

Subscribed and sworn before me this 24th day of April 2018 at 1:11 a.m/p.m in Fort Worth, Texas.

JEFFREY L. CURETON
United States Magistrate Judge

Complaint - Page 13 of 13